Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Rita F. Lin, Judge Presiding

```
S.G., by and through their      )
guardian SIRREON GOODSON,       )
individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiff,            )
                                )
  VS.                           )       NO. 3:25-cv-02554-RFL
                                )
EPIC GAMES, INC.,               )
                                )
          Defendant.            )
_____)
```

San Francisco, California
Tuesday, August 12, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

        THE HODA LAW FIRM, PLLC
        3120 Southwest Freeway
        Suite 101 PMB 51811
        Houston, Texas  77098
  **BY:  MARSHAL HODA, ATTORNEY AT LAW**

        FITZGERALD MONROE FLYNN  PC
        2341 Jefferson Street - Suite 200
        San Diego, California  92110
  **BY:  JACK FITZGERALD, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
        Official Reporter, CSR No. 12219

1    **APPEARANCES**:    (CONTINUED)

2    For Defendant:

3                         FAEGRE DRINKER BIDDLE & REATH LLP
                         1177 Avenue of the Americas - 41st Floor
                         New York, New York  10036

4                BY:  **JEFFREY S. JACOBSON, ATTORNEY AT LAW**

5                         FAEGRE DRINKER BIDDLE & REATH LLP
                         Four Embarcadero Center - 27th Floor

6                         San Francisco, California  94111

                BY:  **ALYSSA S. WOLF, ATTORNEY AT LAW**

7

    Also Present:        **Nikita Arora, Epic Games**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **<u>Tuesday - August 12, 2025</u>**       <u>10:03 A.m.</u> |

1    **<u>Tuesday - August 12, 2025</u>**                    <u>10:03 A.m.</u>

2                        <u>P R O C E E D I N G S</u>

3                           ---o0o---

4        **THE COURTROOM DEPUTY:**  All rise.  Court is now in

5    session.  The Honorable Rita F. Lin is presiding.

6        Please be seated.

7        Calling Civil Action 25-2254, S.G., et al. vs. Epic Games,

8    Inc.

9        Counsel, please approach the podium and state your

10   appearances for the record, beginning with counsel for

11   plaintiffs.

12       **MR. HODA:**  Good morning, Your Honor.  Marshal Hoda for

13   the plaintiff S.G. in this case.  I'm here with my co-counsel.

14       **MR. FITZGERALD:**  Good morning, Your Honor.  Jack

15   Fitzgerald.

16       **MR. JACOBSON:**  Good morning, Your Honor.  Jeffrey

17   Jacobson from Faegre Drinker Biddle & Reath on behalf of Epic

18   Games.  I have client representative Nikita Arora, and my

19   colleague Alyssa Wolf in the gallery.

20       **THE COURT:**  Good morning to all of you.

21       Let's just start with the questions that I put out last

22   week for you all.  And thank you all for bearing with us where

23   we initially had canceled the hearing because I had only the

24   information from the initial briefing; but then upon the

25   surreply and the response to the surreply, I had additional

questions.  So I appreciate you all being here this morning to

help the Court work through those.

So let's just walk through the questions; and once we get

through those, if there's anything additional you all think I

need to know before I enter a ruling, I'd be happy to hear it.

So let's just start with the first question.  I'm not

going to read the whole question but, in essence, if I cannot

infer that S.G. himself signed the End User License Agreement,

shouldn't the question of whether S.G. has agreed to arbitrate

his claims with Epic Games, despite being a non-signatory, be

decided by the Court rather than the arbitrator?

That's a question for Epic Games, so I'll let Mr. Jacobson

start.

**MR. JACOBSON:**  So, first, Your Honor, thank you very

much for doing it the way you did it.  There is nothing better

for advocates on either side than coming into court knowing

what's on the judge's mind, and so I'm --

(Reporter interruption for clarity of the record.)

**MR. JACOBSON:**  It is wonderful to have the questions

in advance, and I want to thank Your Honor for the way that you

do this.

Your Honor's question implicates two separate questions.

The first is:  Can you infer that S.G. himself accepted the

EULA?  And then the second part is:  If not, who decides?

On the first part of that question, Your Honor, before the

1    suit was filed, two different groups of lawyers on behalf of

2    S.G. wrote letters to Epic Games saying S.G. himself accepted

3    the EULA.  EULA is E-U-L-A, End User License Agreement.  So

4    that was how we started this, is we had two sets of lawyers say

5    S.G. accepted the EULA.

6        Your Honor was concerned about the 2022 to 2024 time frame

7    when, according to the complaint, we know that S.G. was using

8    the account that his father created.

9        So in that time frame in 2023, we have, on November 18th,

10   2023, a user of the account accepted the EULA on a PlayStation;

11   and on November 19th, a user of the account accepted a EULA --

12   accepted the EULA on the Goodsons' Xbox.  So we have two EULA

13   acceptances in the 2023.

14       It also might be relevant to Your Honor that on

15   November 28th, 2020, the EULA was accepted on a Nintendo

16   Switch.  And so it's possible that that's another time where we

17   might wonder who it was who accepted the EULA.

18           **THE COURT:**  Are these acceptances of the EULA in the

19   record?

20           **MR. JACOBSON:**  So in the record -- again, when we --

21   when we put in the declaration from Joshua Shaw, I thought we

22   were going to be fighting this on the ground of disaffirmance,

23   and so I didn't know -- it's on me.  I mean, we could have

24   listed all of the dates in the Shaw declaration.  We can

25   certainly supplement that declaration if need be.  I've

1    provided all of these dates to opposing counsel in advance of

2    the hearing so they would know that I was going to be coming in

3    with this information.

4         But so in 2023 -- the EULA -- I'm sorry.  The Shaw

5    declaration did say that there were multiple acceptances,

6    including the July 2024 date that we provided.

7         Your Honor's question implicated 2023.  That's why I'm

8    coming in with those two dates in 2023.  So from -- from our

9    perspective, the EULA either was accepted by S.G. on one of

10   those occasions; or if it was accepted by Mr. Goodson, his

11   father, it was accepted on his behalf because at that time S.G.

12   was playing the game.

13        The second part of Your Honor's question is harder.

14   You know, I think that if we don't -- I don't think we need to

15   get beyond the first part of that because I think that with

16   those dates in mind, it becomes much clearer that the EULA

17   either was accepted by S.G. himself as the original letters

18   stated, or it was accepted by Mr. Goodson in 2023, and maybe

19   2020, at a time when S.G. was certainly using the account,

20   maybe was even the primary user of the account, and it was

21   accepted on his behalf.

22        Once we get to that, then everything else becomes a scope

23   or enforceability dispute that goes to the arbitrator.  If

24   Your Honor concluded that it was -- it was a question for the

25   Court, or it was at least a debatable proposition whether it's

1   for the Court, I have three cases that we've cited to the Court

2   in our briefing where judges said:  No, this -- because

3   contract formation is not at issue, there's no dispute that at

4   least Mr. Goodson accepted the EULA.  This becomes a question

5   of the scope of that agreement.

6        We've got the *Sanchez against Nintendo* case that we cited

7   in the papers, the *Mendieta against Credit Management* case, and

8   the -- my case, the *S.G. against Epic Games* case where the

9   judges in California sent those disputes to arbitration to

10  decide scope and enforceability.

11       I wish I could read you two paragraphs of reasoning from

12  any of those courts that said this is the way it ought to go.

13  I mean, frankly, Judge Alsup in the transcript where he made an

14  oral ruling, I believe, said words along the lines of:  This is

15  not my best work, Counsel, but it's what I'm deciding.

16       So I can't -- I can't tell you, Your Honor, that you've

17  got controlling law, you've got to do it this way; but three

18  judges went that way, zero judges have so far gone the other

19  way.  And so I think if Your Honor felt it was a debatable

20  proposition, you would be the first to decide that it's for the

21  Court to decide, but I can't tell you that's the craziest thing

22  to do.

23            **THE COURT:**  Why doesn't *Kramer* control that issue?

24  Because if I do get there and I can conclude that I can't

25  determine that S.G. himself signed the EULA and we're in a

1  situation where I need to figure out if S.G.'s father signed it

2  on his behalf, that seems to me a situation very similar to

3  *Kramer* where you have an attempt to bind a non-signatory and

4  then you're going through the equitable estoppel analysis and

5  the agency analysis, which is what the Ninth Circuit does in

6  *Kramer*.  Why isn't *Kramer* controlling on this?

7         **MR. JACOBSON:**  I think, Your Honor, *Kramer* is a very

8  different situation.  So in *Kramer* you have a car manufacturer

9  that is a complete stranger to an agreement between a car

10  dealer and the customer was trying to insert itself into that

11  agreement.

12      This is different.  This is there is clearly an agreement

13  between the father, at the very least, and Epic Games.  So this

14  is not Epic Games trying to come into an agreement that it is

15  not a party to, which is the situation in *Kramer*.

16      Here, the EULA is designed for a parent to accept it on

17  behalf of a minor, which is what we think happened at least in

18  2023, if not before.

19      So I acknowledge, I mean, *Kramer* is there and it deals

20  with a now-familiar situation of car manufacturers trying to

21  take advantage of arbitration agreements that they didn't

22  promulgate themselves but here, this is Epic Games' agreement.

23  It was designed for parents to accept it on behalf of players

24  who are minors, and so we're not -- I think that *Kramer* is not

25  controlling in this particular situation.

1          **THE COURT:**  Let me give plaintiff an opportunity to

2    respond.

3          **MR. HODA:**  Yes, Your Honor.  A few points if I may.

4       First, I'd like to start with some of the factual issues.

5    On our reading of the record, there is no evidence in this

6    record anywhere that S.G. agreed to anything.  We don't see it.

7          This letter, one of which I wrote, that counsel has

8    referred to several times, simply does not say what it is

9    purported to say.  This is at Document 23-2.  It was attached

10   to their initial motion, and in no place in that letter do we

11   make any sort of admission that S.G., in fact, created the

12   account at issue here.

13      It notifies them of our intent to proceed with claims.  It

14   tells them the account name.  It says S.G. and his father can

15   be reached at this phone number, and does not contain any sort

16   of admission that the account was created by S.G.

17          **THE COURT:**  I did see the line [as read]:

18          "Please be advised that Meadow's Clients --

19      minor children or those who were playing Fortnite as

20      minor children" -- "or began playing Fortnite as

21      minor children -- could not and did not enter into

22      any contract with Epic through the current or prior

23      iterations of its End User License Agreement."

24      I think that that could be read as understanding that the

25   letter is representing that S.G. did not enter into a contract.

1    Then it says:  In the alternative, the clients disaffirm.

2        So those are two different theories.  Is that the language

3    that you're pointing to then?

4        **MR. HODA:**  That, I believe, you're pointing -- so

5    there were two separate letters.  That one, I believe, is the

6    one from the other law firm.

7        But, yes, Your Honor, I believe the language there is

8    still consonant with the point we're making here, which is if

9    the idea is that the factual basis for the purported ascent of

10   S.G. personally in creating this account is one of these

11   letters, then we don't believe it to be there in either of

12   those letters.

13       Disaffirmance is very -- and we've attempted to make this

14   very clear in our papers -- there is a very clear distinction

15   between the question of the existence of a contract, a

16   formation, and disaffirmance in the situation where a minor

17   later says:  This contract -- you know, I may have entered this

18   but I want to disaffirm it because of my lack of majority at

19   the time.

20       We are not arguing disaffirmance as I believe Your Honor

21   knows.  This is a question, in our view, solely of formation

22   and the existence of this contract and the first-instance

23   provider.

24       **THE COURT:**  So why shouldn't I let them put in

25   additional evidence in response to your surreply evidence, put

1  in additional evidence about the log-in and when they occurred

2  and on what devices and that there's a log-in on the Nintendo

3  Switch device, which creates an inference that either S.G.

4  logged in on that device or that -- and signed the EULA or that

5  his father did so on his behalf so that he could play since

6  it's in time to the transactions at issue?

7      Why shouldn't I let them put in more evidence and

8  supplement the record?

9      **MR. HODA:**  Your Honor, I may be mistaken, I don't

10  believe I've seen any request by them to do so.

11      **THE COURT:**  But he just asked me and said he showed

12  you the evidence.

13      **MR. HODA:**  He sent an e-mail with a few lines about

14  when those acceptances of the EULA occurred, but with no

15  attachments, no -- no documentation of any of that.

16      Candidly, Your Honor, if a request were to be made, I

17  don't believe we would oppose it.  We're happy to take on

18  whatever evidence they want to put in the record.

19      We don't believe that the evidence is going to show that

20  S.G. agreed in this instance, and I'll make a few points as to

21  why.

22      In the -- you know, I apologize for putting the Court

23  through the relitigation of a year-old e-mails from lawyers,

24  but sometimes -- between lawyers, but sometimes I guess we have

25  to do that.

1          In response to that initial e-mail, Epic's attorneys

2     affirmatively identified this as an account that was created

3     with an adult birthdate and that was created by Sirreon

4     Goodson, the father.  So they affirmatively, in their own

5     reply, identified this as an account that was associated with

6     the father, and that's exactly what happened here.

7          And that's why this case is just like the *S.T.G.* case, the

8     *S.T.G.* case, which is S.G. --

9               (Reporter interruption for clarity of the record.)

10          **MR. HODA:**  S.T.G., and this is S.G.  There's just one

11     more -- one extra letter in there.

12          The reason you might hear both counsel citing that case in

13     opposite directions, is there were seven different minor

14     plaintiffs there, and there was a distinction between six of

15     them, on the one hand, who were compelled the arbitration -- to

16     arbitration and one, on the other, who wasn't.  And the one who

17     wasn't -- and this is currently on appeal to the Ninth

18     Circuit -- the account was created by the parent and the child

19     had used the parent's account, and that's the same situation we

20     have here.

21          When we relied on that case very directly in our

22     opposition to Epic's motion to compel arbitration, their reply

23     said:  Well, these -- this is distinguishable from *E.V.A.*, the

24     minor child who was, we argue, similar to S.G., because every

25     time S.G. made a purchase here, S.G. had to affirmatively agree

1    to the terms.

2        Well, with all due respect to opposing counsel, we pointed

3    out in our -- in our surreply that's not, in fact, what the

4    evidence showed.  That was, in our view, respectfully, a

5    misstatement of what the evidence showed in attempting to

6    stretch it a bit too far.

7        That was only required at the times where a payment method

8    was entered.  And we have put a declaration in the record with

9    our surreply from Sirreon Goodson saying that each time a

10   payment method was entered, it was he who entered the payment

11   method.

12       So when there's been the opportunity to bring facts

13   forward, respectfully, we believe that we have done so, but we

14   can't respond to evidence that is simply listed in an e-mail

15   from counsel without any documentary support the day before the

16   hearing.  We're happy to respond to any evidence that's

17   properly put in, but we haven't seen it.

18       And on this record we believe there is simply no

19   indication anywhere that we have seen that S.G. himself, the

20   minor, actually agreed at any point to this arbitration

21   agreement.  And we think that puts us in line with *S.T.G.*  We

22   think it puts us in line with the cases that we cite on page 6

23   of our opposition and, of course, the *Kramer* case that

24   Your Honor noted and in the first question.

25       And what those cases that we cited in page 6 of our

1  opposition say over and again -- and it's not hard to find

2  cases for this proposition -- that while -- while disputes --

3  while the trend in the law may have been in recent years to

4  recognize that disputes about the scope of arbitrability may

5  very well be for arbitrators, by default Americans and people

6  here, people in America have access to their courts; and before

7  there's been a finding that they entered into some contract,

8  they cannot be compelled to arbitrate.  The fact that it exists

9  must be decided by a Court first regardless of whatever the

10  language of the contract may be.

11      So I hope I've addressed what I could there, Your Honor.

12          **THE COURT:**  Thank you.

13      Let me move on to Question 2.  We could come back to this

14  topic a little bit later, but I want to ask about Question 2,

15  which is a question really for Epic Games.

16      On what basis could the Court infer that S.G.'s father

17  accepted the EULA on S.G.'s behalf as part of the act of

18  entering a payment method?  Are you still advocating that

19  position in light of the new information that's been provided

20  in the surreply?

21          **MR. JACOBSON:**  So in the complaint, Your Honor, at

22  paragraphs 5 and 25, the allegation is that S.G., the minor,

23  made purchases with his own money in the Fortnite Item Shop,

24  and I separate those two things because they're two separate

25  concepts, both of which are important.  S.G. made the purchases

with his own money.  S.G. made the purchases on the Fortnite
Item Shop.  Those allegations in the complaint are very
important because they're the reasons why S.G. and not the
father is the plaintiff here.  He says, "I made it with my own
money."

     And the assertion that the purchases were made on the
Fortnite Item Shop is the reason why Epic Games is the
defendant and not, for example, Sony, which runs the
PlayStation Marketplace, or Microsoft, which runs the Xbox
Marketplace.

     We briefed this because the Court has to accept the
allegation is true, that S.G. made purchases on the Fortnite
Item Shop.

     I've known from the beginning of this case that S.G. made
no purchases on the Fortnite Item Shop.  All of the purchases
that were made in this account have been made on third-party
marketplaces.  Not my marketplace, not anything we have control
over.  If there were countdown timers, they weren't our
countdown timers.

     Now, that's not in the record nor could I put it in the
record because that's not the allegation in the case.  We've
got to live by paragraphs 5 and 25 of the complaint.

     But in their motion for leave, all of a sudden, S.G. has
said:  But wait a minute.  They put in this declaration from
their investigator talking about how these items look on the

1    Nintendo Switch Shop, and they raised the issue of third-party

2    marketplace purchases.

3        Now, again, we're here at the pleading stage.  I'm

4    perfectly happy to litigate this case as though these purchases

5    were made on the Fortnite Item Shop, and so we put before

6    the Court how it works when you make a purchase on the Fortnite

7    Item Shop.  One must attest that:  I'm over 18, I'm an

8    authorized user of this method of payment, and I accept the

9    EULA.

10        **THE COURT:**  I have to tell you, I don't play

11    Fortnite -- maybe you guessed that about me -- but I have a

12    basic misunderstanding, then, of how this works.

13        So I had thought that you could buy items on Fortnite

14    through a computer or through a PlayStation or a Switch, and

15    that no matter whether you were buying on a PlayStation or a

16    Switch or a laptop computer, that all of those would

17    ultimately -- all of those purchases would be from the, quote,

18    Fortnite Item Shop.

19        **MR. JACOBSON:**  No.  You were right to --

20        **THE COURT:**  Help me to understand where I'm going

21    wrong there.

22        **MR. JACOBSON:**  You were right to the last part.  So

23    you can play Fortnite on a variety of devices; and thanks to

24    some litigation victories, hopefully more devices soon; but

25    for -- relevant to S.G., S.G. played on a Switch, on an Xbox,

1   on a PlayStation.  Each of those devices has its own

2   marketplace that's run by Nintendo in the case of the Switch,

3   Microsoft in the case of the Xbox, Sony in the case of

4   PlayStation.

5       Your Honor can actually see the differences because in the

6   complaint, they have pictures from our item shop.  So

7   Your Honor is absolutely right, you can transact directly with

8   Epic Games.  If you're playing on a PC, for example, you can

9   transact with Epic Games in the Fortnite Item Store.  That is a

10  thing.  That's my shop.  That's the Fortnite Item Shop.

11      And if you look in the complaint, at the top it says "Item

12  Shop."  If you look at their investigator's declaration that

13  they put in with the surreply, when the investigator made

14  purchases on the Nintendo Switch store, it doesn't look the

15  same.  There's today "Item Shop" at the top of it.  That's a

16  Nintendo store.  That's their marketplace.  The transaction is

17  with them.

18      **THE COURT:**  You can use your Switch to buy items from

19  Fortnite but it's not the, quote/unquote, "Fortnite Item Shop";

20  is that what you're saying?

21      **MR. JACOBSON:**  To buy items for use in Fortnite, but

22  you're making that purchase from Nintendo.  We get a share of

23  the revenue, to be sure, but the transaction is -- we're not a

24  party to that transaction.  The transaction is with Nintendo on

25  a Nintendo store that they design, they control, they get most

1    of the money.

2        And then they send an electronic signal to Epic Games

3    saying, "This person bought a thousand V-Bucks.  Deposit a

4    thousand V-Bucks into the account," but the transaction is with

5    a third party.

6        Now, again, I want to be clear what I'm not saying here.

7    I'm not trying to get this case dismissed right here and now.

8    What I am saying is, if they've got a claim against Epic Games,

9    they've got to arbitrate it pursuant to the EULA; but if --

10        **THE COURT:**  I think their point is that there is a

11    transaction on the Nintendo Switch where S.G.'s father saves a

12    payment method in there and S.G. or his father buys a thousand

13    V-Bucks on the Switch, and then S.G. can later go to the

14    Fortnite Item Shop -- I know you're saying that's not what

15    happened, but S.G. can go to the Fortnite Item Shop and use

16    those V-Bucks to buy Fortnite items.

17        **MR. JACOBSON:**  Again, I was with you right till the

18    end.  In other words, yes, a parent can save a method of

19    payment on the Nintendo Switch Shop and then authorize the

20    minor to make purchases without further parental involvement,

21    but purchases in that instance would not be from the -- I'm

22    going to use air quotes for the court reporter's benefit -- the

23    Fortnite Item Shop.

24        Again, the Fortnite Item Shop is the Epic Games Store.  If

25    they're making the purchases on the Nintendo Switch or the

```
 1   Microsoft Xbox Store, that is not the Fortnite Item Shop.  The

 2   Fortnite Item Shop is an all-capitalized term in the complaint

 3   to refer to a purchase made from Epic Games.

 4       Now, again, I don't know whether -- I don't -- I mean,

 5   there's three possibilities.  One possibility is they thought

 6   that the transaction was on the Fortnite Item Shop with Epic

 7   Games.  One possibility is they were doing it the way Your

 8   Honor was just formulating it, and they were thinking about it

 9   broadly.  And the third possibility is they were mistaken and

10   they now know, maybe after further conversations with their

11   client, that the transactions were on the third-party

12   marketplaces.

13       But if it --

14       THE COURT:  Can you use V-Bucks to buy things in the

15   Fortnite Item Shop?

16       MR. JACOBSON:  So, Your Honor, V-Bucks is a virtual

17   currency.  So once you have V-Bucks, you can transact with

18   V-Bucks on any of these platforms to acquire -- there's very

19   little you can buy with real money on these shops.  Usually you

20   have to buy V-Bucks first and then you transact with V-Bucks.

21       But the point is, any transaction you make on a device, on

22   a third-party device like a Switch, a PlayStation, an Xbox,

23   that transaction is always with the marketplace, the

24   third-party marketplace, not with Epic Games.

25       If you're talking about the Fortnite Item Shop, that's our
```

1  marketplace which you can only access off of those platforms.

2  If you're on the platforms, you've got to transact with the

3  platforms.

4      So -- but to go -- this is a long way around to

5  Your Honor's question.  So the point is:  If there was a

6  transaction on the Fortnite Item Shop, then somebody at some

7  point had to provide a method of payment and check that --

8  you know, provide the attestation that "I'm over 18, authorized

9  user of this account."

10      If the transaction was not on the Fortnite Item Shop, they

11  don't have to do that.  That's not our screen.  That's not our

12  design.

13      So, again, living by the words of the complaint, if the

14  transactions in 2022 and 2023 and 2024 were actually with us,

15  somebody entered a method of payment, somebody went through

16  that box.

17      If the transactions were not with us, they didn't; but

18  then, again, I don't belong here because I'm not -- it's not my

19  store, not my design.  They're not complaining about my

20  countdown timers.  They're complaining about somebody else's.

21      **THE COURT:**  Let me give plaintiff an opportunity to

22  respond.

23      **MR. HODA:**  Yes, Your Honor.

24      We are, again, having a debate about somewhat complex

25  evidentiary issues about which none of the documentary evidence

```
 1   is in the record and which were communicated to us yesterday by

 2   e-mail.

 3        I would submit that this information has been known to

 4   Epic for quite some time and that it would have been, perhaps,

 5   more efficient to put it in the record earlier and have a full

 6   opportunity for everyone to review and respond.

 7        The question Your Honor asked earlier, I believe, is the

 8   right one; that these V-Bucks are purchased and then used to

 9   make in-game purchases.  And we would say that if deceptive

10   countdown timers are causing purchases to be made, whether they

11   be with V-Bucks or CryptoBucks or whatever kind of bucks, if

12   those were ultimately paid for with U.S. dollars and they have

13   value, that those -- the claims that we have made under these

14   state consumer protection statutes still stand.

15        So it's unclear to me, because I don't have the benefit of

16   any documentary evidence on this point, whether when we are --

17   counsel is using the term "transactions," if we're only talking

18   about the V-Buck transactions initially purchased for cash or

19   in-game item shop purchases, and I think that points to the

20   deficit we're all working from here with an undeveloped record

21   on this point.

22        However, I would say, regardless, the evidence in the

23   record shows that this was an account that was created by

24   Sirreon Goodson and shared, and that both played and made

25   purchases from this account.
```

1    So those purchases that were made by S.G. were not

2    purchases where S.G. went directly and asked Sirreon Goodson to

3    create an account to make a purchase right then.  These are

4    payment methods that were entered by the father, and then over

5    time the account was shared, purchases were made by both

6    interchangeably.

7        We think that in that sense this is a case much like the

8    cases that were mentioned in Your Honor's questions -- let me

9    remind myself of the name -- *Comer v. Micor* -- where S.G. is an

10   eight-year-old at the time that these agreements are entered

11   into, does not have knowledge of them, and in the suit is not

12   seeking to take advantage of any such agreement.

13       The claims in this suit are brought under state consumer

14   protection statutes.  There's no breach of contract claim in

15   this suit, and that's the exact same thing that we saw on

16   display in that case and that's how we believe the case is

17   analogous and the same decision should apply.

18       **THE COURT:**  So this brings me to -- I think we've

19   really covered Question 3 already, so I'm not going to cover it

20   again, but I want to ask you what's behind Question 3, which is

21   the concept of agency.

22       So if S.G. and his father are both playing Fortnite on the

23   same account and they're using the same store payment methods,

24   S.G.'s father has signed the EULA in each instance, both for

25   the payment method before playing the game, and they're just

1    sharing the account back and forth.  Why isn't that a situation

2    in which S.G.'s father has signed the EULA on both of their

3    behalf for both of their benefit?

4        Much like every time, you know, you take your kid to the

5    bouncy house and you sign the waiver, then your kid goes in the

6    bouncy house and jumps around in there, your kid is bound by

7    the arbitration agreement you've signed with the jumpy house

8    provider.  Why is this different from that type of situation?

9        **MR. HODA:**  Right.  The answer here is that the way

10   that the accounts are structured are such that this is the

11   account of Sirreon Godson, and there's an agreement between the

12   father and Epic for an account that is owned and created by an

13   adult.

14       There's the option for minors to create their own

15   accounts, but that was not the case here.  And this ultimately

16   was S.G.'s own money, and he did not agree to the terms in the

17   contract.  And the agency relationship was not created because

18   S.G. had no idea that the agreement was being entered into at

19   the time.  And that's the same situation that we see in the

20   *Micor* case and cases of that nature.

21       **THE COURT:**  I think the *Micor* case is different

22   because that's under a different line of reasoning.  That's a

23   line of reasoning where it's direct benefit estoppel, which I

24   agree with you is an uphill battle for Epic Games to claim here

25   because S.G. didn't know about the agreement.

1    But an agency relationship doesn't necessarily require the

2  principal know of the agreement that's being signed.  You can

3  imagine lots of situations where parents sign for the benefit

4  of their child when their child is an infant.

5         MR. HODA:  Right.

6         THE COURT:  So it's hard for me to understand how that

7  would bar an agency theory on which S.G. would be bound to the

8  arbitration agreement.

9         MR. HODA:  Right.  And I would point to the terms of

10  the arbitration agreement themselves.  The terms say that the

11  agreement is between you and Epic, and it's not -- no one is

12  purporting to create an agency relationship at the time.  We

13  would have to read that into the contract afterward.

14    And we would argue that the scope of that agency is

15  defined at the time that the agreement is entered into; and the

16  time the agreement was entered into Sirreon Goodson, the

17  father, was creating an account for himself and he was not

18  required at each subsequent point at each purchase to go back

19  and enter into that agreement again, or no one was, for S.G.'s

20  purported benefit.

21    So it can't expand.  What we've seen here is that the --

22  the concept of what this agreement entails has expanded and

23  contracted as we've proceeded through this dispute, and now

24  we're being --

25         THE COURT:  The concern I have is if it's a situation

1   where maybe Sirreon Goodson initially made the Fortnite account

2   for himself, but then as his kid is growing older, his kid

3   starts playing Fortnite too on the same account, then he is --

4   and Sirreon Goodson is continuing to accept the End User

5   License Agreement periodically over time, at a certain point

6   obviously he knows his son is playing on the account so he's

7   accepting it for both of them.

8        I understand your point, that right now the record doesn't

9   show that.  Counsel's representation is that he can put in a

10  declaration that shows all of that.  If he were able to do

11  that, do you have an argument as to why this isn't an agency

12  relationship?

13       **MR. HODA:**  Your Honor, I would -- I would -- I would

14  request the opportunity to formulate that once we have the

15  evidence in front of us and see what it shows.

16       Now I think we are a bit in the territory of giving Epic

17  the benefit of evidence that we haven't seen; but, of course,

18  we would respond to that by going back to our client, finding

19  out more information about what the facts were at the time.

20       And really we've narrowed it down, I believe, to two

21  instances of acceptance of the EULA in 2023 that were in the

22  relevant time period where the purchases were made.  So we're

23  not talking about numerous acceptances of a EULA.  It's really

24  two, and they were made back-to-back on consecutive days in

25  November of 2023.

1          So there is a bit of -- in the initial Shaw declaration

2     there was a bit of vagueness there about, you know, the EULA

3     was accepted many, many times over many years.  Now we know,

4     from benefit of counsel's recent e-mail, that we're talking

5     about essentially two acceptances this comes down to; and with

6     that sharpened up, we would ask for the opportunity to respond

7     to that with that evidence in front of us.

8          **THE COURT:**  Let me check in with the parties.  I am

9     inclined to allow -- since I allowed surreply evidence, to

10    allow responsive evidence.  I think it's the right thing to do.

11    I might as well get the facts so I can make the right decision

12    up front.

13         So in terms of getting the evidence from Epic, my proposal

14    would be for you to file a declaration by Thursday, that's

15    August 20 -- August 14th.  Is that feasible?

16         **MR. JACOBSON:**  Yes, Your Honor.

17         **THE COURT:**  And then in terms of reply, an opportunity

18    to respond to that evidence, what would your proposal be for

19    plaintiffs?  I was thinking seven days to respond.

20         **MR. HODA:**  Certainly.  We could do that, Your Honor.

21    No problem.

22         **MR. JACOBSON:**  Does it matter, Your Honor, if it's

23    Friday to Friday instead of Thursday to Thursday just because

24    I'm going to be traveling the rest of the day?  If I can get on

25    this tomorrow and then file it by Friday and then seven days

1   for them, that would be a little more breathing room if that's

2   okay.

3               THE COURT:  Does that work for plaintiffs?

4          MR. HODA:  No objection here.

5               THE COURT:  Great.  August 15th to file the

6   declaration.  Just the declaration, no more briefing.

7       And then August 22nd for plaintiff to submit a reply

8   declaration.  And no more than five pages of briefing in

9   response -- legal argument in response to the supplemental

10  evidence provided by Epic Games.

11          MR. JACOBSON:  If I just -- one -- I'll pose the

12  question through the Court, but counsel made a statement about

13  two minutes ago saying that ultimately this was S.G.'s money.

14  And I'm not sure I understand -- I want to make sure that when

15  we put in the declaration, I'm addressing counsel's concerns

16  fully.

17      I don't really know what "ultimately this was S.G.'s

18  money" meant because by definition, the methods of payment here

19  were Mr. Goodson's, the father's, credit cards.  So if the

20  transaction is with Mr. Goodson, it would be helpful to me, if

21  the Court feels inclined to pose the question to opposing

22  counsel, what does that mean, that ultimately this was S.G.'s

23  money, so I know what I'm addressing in the declaration.

24              THE COURT:  I'm fine with counsel answering that

25  question.

1          **MR. HODA:**  Sure.  As we all know, everything has to be

2     paid for electronically one way or another, and S.G. does

3     chores and things like that, earns money for himself, but then

4     doesn't have a debit card to pay for it.  And so, therefore,

5     you have a situation where you essentially have kind of a

6     running account, if you will, and those -- those dollars can be

7     used to purchase discretionary things that S.G. might want.

8          **THE COURT:**  So are you saying that it's a credit card

9     payment or debit card payment that's made by Sirreon Goodson

10    but then he'll debit S.G.'s money, either cash or his chores

11    account, to reimburse Sirreon Goodson for the credit card

12    payment that's made?

13         **MR. HODA:**  Correct.

14         **THE COURT:**  Okay.  I know we kind of got into

15    Question 4 essentially already.  I'll just give Epic Games a

16    final opportunity to let me know if you think there is anything

17    else I should be thinking about in terms of the direct benefits

18    estoppel issue.

19         **MR. JACOBSON:**  Thank you, Your Honor.

20     I'm troubled by Your Honor's thought that it's an uphill

21    battle because from my perspective, it's not an uphill battle

22    at all for the following reasons:  The controlling case on this

23    one is *Nguyen against Barnes & Noble*, the Ninth Circuit's

24    decision where the Ninth Circuit -- I mean, the language that

25    they used -- I'm sorry -- "A non-signatory to an arbitration

1  agreement may be compelled to arbitrate where the

2  non-signatory," and internal quotes, "knowingly exploits the

3  benefits of the agreement and receives benefits flowing

4  directly from the agreement."

5       So Fortnite, Your Honor, is a closed system.  It's not

6  like a public website.  The only way you can get in to play

7  Fortnite is by creating an account and accepting the EULA.  The

8  reason for that goes well beyond the dispute resolution terms.

9       The reason for that is the EULA is what says:  You can't

10  cheat.  You can't use unauthorized software to have something

11  aim the weapon for you.  You can't harass other players that

12  you're playing with online.  You can't steal intellectual

13  property.

14       That's all in the EULA.  All game-play in Fortnite has to

15  be subject to the EULA.  If it wasn't -- if it was as easy to

16  get out of it as me saying that I'll create an account and then

17  give access to Mr. Hoda and now he's not bound by the EULA so

18  he can cheat or he can harass other players, the system that's

19  played by tens of millions of people would break down.

20       So it's really no different from the Padres are playing

21  the Giants again tonight.  Everybody in that stadium is going

22  to have a ticket.  I can't run on the field and say, "Well, I

23  didn't know that there was a contract associated with that."

24       So direct benefits estoppel, it's not knowing there was a

25  contract; it's knowing that you're -- you're accepting the

benefits, in this case by playing Fortnite.

One of the cases we cited was *Yeh against Tesla*.  The plaintiffs was a one-year-old.  The one-year-old didn't know that the father had signed a contract to buy that car that he was being so lovingly inserted into the car seat in the back.  The issue was the father accepted the benefits of the contract for the benefit of the child.  The child was bound to arbitrate the privacy claim arising out of it.

Another case we cited was *Atencio against Bird Rides*.  Mother used son's account to take a scooter.  There was evidence in the record, the mother attested, "I had no idea how my son signed up for an account."  It didn't matter.  The court said the mother accepted the benefit by riding the scooter.

There's another case that we cited, it applies Washington law but Washington law is no different from California law on this, in *Marshall against Hipcamp*.  Boyfriend and girlfriend share a campsite pursuant to the girlfriend's agreement.  There was negligence.  The boyfriend sued.  The court ruled boyfriend had to follow the dispute resolution terms of the girlfriend's contract because he accepted the benefits by camping on the campsite.

The point is:  I've got case after case after case saying that that's what knowing exploitation means.  There is no case on the other side.

Now, Your Honor, I cited *Hofer* case, and Your Honor said

 1   there was a line there about knowing about the contract.  My

 2   position on that is if you -- the whole decision -- nothing in

 3   that decision suggests that knowledge of the contract was what

 4   controlled.  In fact, a couple of lines later the Court said

 5   not.

 6        The citation in that case involved a Telephone Consumer

 7   Protection Act case where a boyfriend was briefly living with a

 8   girlfriend.  I mean, I've got the citation for the case that

 9   was cited in there.

10        **THE COURT:**  Yeah, but what the *Comer* case -- which was

11   a Ninth Circuit case, where, you know, you have someone who's a

12   participant in the trust that's managed by other people for his

13   benefit so he doesn't know about the contracts that have been

14   entered into because he's just a passive participant.  He's

15   not --

16        **MR. JACOBSON:**  Again, there were no knowing avail- --

17   sorry.  There were no knowing availments of the contract's

18   benefits in that circumstance.  The Ninth Circuit didn't

19   discuss direct benefits estoppel in this context.  And, again,

20   that was pre-*Nguyen*.  In the post-*Nguyen* world -- Nguyen is

21   N-G-U-Y-E-N -- in the post-*Nguyen* world, the question is:  What

22   does "knowingly exploit the benefits of a contract" mean?

23        Here, it means playing Fortnite.

24        And, again, in the *TCPA* case that was cited in *Hofer*,

25   there the boyfriend didn't know how Comcast got his number to

call him 27 times in violation of the TCPA.  They tried to argue that he was bound by estoppel because he watched television in his girlfriend's apartment.  And the judge says: No, you're not going to be able to arbitrate a TCPA when all he did was watch television.

    But here, you're talking about logging in to a Fortnite account, entering a closed system, playing a game that's subject to rules.  It can't be that the question is:  Did the person who's playing --

    **THE COURT:**  Most people who watch a TV know that, you know, the cable on the TV has to come through some kind of agreement with the cable company in general; but, you know, if you don't know about the contract, it's -- it seems like a similar situation.

    **MR. JACOBSON:**  Except he didn't provide his phone number to the cable company and didn't know how they got his phone number.  This is a different situation where -- and, again, so, I mean, in that circumstance maybe the court could have -- but the point is the court could have come out differently.

    But there the issue was the boyfriend said, "I don't know how they got my number.  It wasn't my contract.  I didn't sign up for it.  All I did was passively watch television."  It's not the same thing as logging into a closed system in the father's account, playing Fortnite in the father's account, and

1    needing to -- necessarily needing to be subject to the rules.

2        Because, again, a finding here that S.G. is not subject to

3    the EULA is not just a finding that he doesn't have to

4    arbitrate, it's a finding that he can cheat.  It's a finding

5    that he can harass other players.  He's either bound by the

6    EULA or he's not, and all game-play in Fortnite has to be

7    subject to the EULA otherwise, again, the system doesn't work.

8        **THE COURT:**  I understand the argument.

9        That is the end of the questions that I have.  I promised

10   I'd give you each an opportunity to tell me anything else you

11   want me to know.  I think we covered things pretty thoroughly,

12   but final word for plaintiffs and then I can hear from Epic

13   Games.

14       **MR. HODA:**  Nothing further from us, Your Honor.  I

15   think we covered the ground pretty well that were set out in

16   Your Honor's very helpful questions.  We appreciate the Court's

17   time today and opposing counsel.

18       **MR. JACOBSON:**  Just one quick thing, Your Honor.

19       So, again -- and I think Your Honor has this point because

20   Your Honor asked it in a question to my colleague -- there's

21   the creation of the account in 2018, which may very well have

22   been Mr. Goodson without a thought in his mind that it was S.G.

23   at the time, but then there were multiple -- we'll provide it

24   in the declaration -- there were a dozen further acceptances of

25   the EULA in 2023, 2024, also 2020, 2021.  We'll put all that in

1  there, but I think Your Honor had it exactly correct, which is

2  that it doesn't matter what was in his head in 2018.  The

3  question is:  In the subsequent acceptances of the EULA, at

4  that point was he doing it as an agent for his son?

5          THE COURT:  Thank you, all.  I'll take the matter

6  under submission and issue a written  order after I receive the

7  supplemental materials.

8          MR. HODA:  Thank you, Your Honor.

9          MR. JACOBSON:  Thank you.

10          THE COURT:  Be well.

11          (Proceedings adjourned at 10:48 a.m.)

12                  ---o0o---

13              **CERTIFICATE OF REPORTER**

14      I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16  DATE:   Friday, August 15, 2025

17

18

19

20  _____

21   Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
           Official Reporter, U.S. District Court

22

23

24

25