UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S. G.,<br><br>       Plaintiff,<br><br>    v.<br><br>EPIC GAMES, INC.,<br><br>       Defendant. | Case No. 25-cv-02254-RFL<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 23 |

Plaintiff S.G., a minor under the age of 13, has brought a putative class action suit against Epic Games, Inc. ("Epic"), alleging the Fortnite in-game store ("Fortnite Item Shop") used fake countdown timers and false discounts to drive purchases of virtual items. Epic moved to compel arbitration based on an arbitration agreement into which S.G. allegedly entered by playing Fortnite and purchasing items in the Fortnite Item Shop. (Dkt. No. 23.) After the motion was fully briefed, S.G. was given leave to file a sur-reply with additional evidence to rebut arguments made in Epic's reply brief. (Dkt. No. 34.) The Court held oral argument on August 12, 2025, during which it granted Epic leave to submit a declaration in response to the sur-reply identifying additional instances in which the arbitration agreement was accepted by the account used by S.G. to play Fortnite. (Dkt. No. 43.) S.G. filed a response (Dkt. No. 44), and the matter is now under submission.

The motion to compel arbitration is **GRANTED**. Defendants have submitted adequate proof that S.G. is bound by the End User License Agreement ("EULA") containing the arbitration provision.

**I.    BACKGROUND**

Epic is the developer of the video game Fortnite, which can be played on various devices, including smartphones, personal computers, and gaming consoles. (Dkt. No. 1 (Compl.) ¶ 12.)

Epic's End User License Agreement[1] states that:

> TO ENTER INTO THIS LICENSE AGREEMENT, YOU MUST BE AN ADULT OF THE LEGAL AGE OF MAJORITY IN YOUR COUNTRY OF RESIDENCE . . . IF YOU ARE UNDER THE LEGAL AGE OF MAJORITY, YOUR PARENT OR LEGAL GUARDIAN MUST CONSENT TO THIS AGREEMENT.

(Dkt. No. 23-1 at 10-11.) The EULA contains an arbitration provision, which delegates gateway questions of arbitrability to the arbitrator:

> You and Epic agree to submit all Disputes between You and Epic to individual binding arbitration. "Dispute" means any dispute, claim, or controversy (except those specifically exempted below) between You and Epic that relates to your use or attempted use of Epic's products or services and Epic's products and services generally, including without limitation the validity, enforceability, or scope of this Binding Individual Arbitration section.
>
> You and Epic agree to arbitrate all Disputes regardless of whether the Dispute is based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory.
>
> . . .
>
> You and Epic agree that whether a dispute is subject to arbitration under this Agreement will be determined by the arbitrator rather than a court.

(Dkt. No. 23-1 at 19-20.) The EULA further provides that players "have the right to opt out of and not to be bound by" its arbitration provision by submitting a written notice to Epic within 30 days of the date on which they first accepted the EULA. (Dkt. No. 23-1 at 22.) In order to opt out of the EULA, users agree that they must include their "name, mailing address, and account name [used] while playing Fortnite." (*Id.*) The EULA advises players that if they do not opt out, they "will be bound to arbitrate disputes." (*Id.*)

The EULA is presented to a Fortnite user in a few different ways. The EULA is displayed when the user downloads the Fortnite software and opens the app for the first time. (Dkt. No. 23-1 ¶ 6.) Before players can begin playing the game, the EULA is displayed on-

---

[1] These provisions are quoted from the July 2024 version of the EULA. The undisputed evidence is that the relevant provisions have remained substantially the same during the period at issue. (*See* Dkt. No. 23-1 ¶¶ 20-24; *id.* at 39-46.)

screen. (*Id.*) Players must accept the EULA in order to proceed with playing the game. (*Id.*) This requirement applies regardless of the platform or device used. (Dkt. No. 23-1 ¶ 5.) Users are also asked to accept the EULA when they enter in payment information to make a purchase from the Fortnite Item Shop. (Dkt. No. 23-1 ¶ 11.) At that time, users are asked to confirm acceptance of the EULA and to attest that they are an adult and authorized to use the payment method. (*Id.*) Finally, every time the EULA is updated, and every time the account is accessed from a different platform or device, players who log in to Fortnite are prompted with the updated EULA on-screen and must again affirmatively select the "accept" button before they can continue playing Fortnite. (Dkt. No. 43 ¶ 5.) Since Fortnite's launch in 2017, Epic has updated the EULA and required players to affirmatively agree to the updated EULA terms over eight times, including most recently for U.S. residents on December 17, 2024. (Dkt. No. 23-1 ¶ 21.)

      Plaintiff S.G. is a minor who resides in Sacramento, California with his father. (Compl. ¶ 6.) S.G. alleges that he is a "Fortnite player" who purchased "numerous items from the Fortnite Item Shop from 2022 to 2024." (Compl. ¶¶ 6-7, 25-26.) S.G.'s father stated that "S.G. played Fortnite using an account that I set up with my email address and birth date in 2018," and that "S.G. and I have shared this account over time." (Dkt. No. 26-1 ¶ 3.) He further stated that though "S.G. made at least some of the purchases at issue in the above-captioned matter using his own money" (Dkt. No. 26-1 ¶ 4.), "[e]ach time a method of payment was entered to enable purchases related to this account, I entered that method of payment myself." (Dkt. No. 32-4 ¶ 3.) At oral argument, S.G's counsel explained that S.G. performed chores for money, and that his father debited S.G.'s chores "account" to reimburse himself for S.G.'s purchases made using his father's stored payment method. (*See* Dkt. No. 42 at 27:11-28:13.)

      Using information provided by S.G.'s counsel, Epic located S.G. and his father's Fortnite player account, which verified that the account was created in March 2018. (Dkt. No. 23-1 ¶ 28.) The data also showed that someone using the account accepted the EULA on November 18 and 19, 2023, July 24, 2024, and December 21, 2024. (Dkt. No. 43 ¶ 6.) In October 2024, Epic received a letter stating that S.G. was seeking to exercise his right to

"disaffirm any agreements made" with Epic. (Dkt. No. 23-2 at 5.) S.G. and his father's Fortnite account has remained active, with numerous games played since the Complaint was filed. (Dkt. No. 23-1 ¶ 36.)

## II.    LEGAL STANDARD

In considering a motion to compel arbitration, the court applies a summary judgment standard and thus may consider evidence outside of the pleadings, such as declarations. *See Hansen v. LMB Mortgage Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (noting that application of the summary judgment standard is appropriate when evaluating a motion to compel arbitration); *R.A. v. Epic Games, Inc.*, No. CV 19-1488-GW-EX, 2019 WL 6792801, at *6 (C.D. Cal. July 30, 2019) ("The present case involves a motion to compel arbitration where extrinsic evidence, including declarations, is considered and both sides filed multiple declarations in support of their positions.").

The Federal Arbitration Act ("FAA") provides that an agreement to arbitrate disputes arising from "a contract evidencing a transaction involving commerce" shall be "valid, irrevocable, and enforceable." 9 U.S.C. § 2. "The court's role under the [FAA] is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The party seeking to compel arbitration bears the burden as to both elements. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). "Generally, the contractual right to compel arbitration may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir.

4

2013) (cleaned up).  The "strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement."  *Id.* (cleaned up).

In deciding whether parties agreed to arbitrate, courts "apply ordinary state-law principles that govern the formation of contracts to decide whether an agreement to arbitrate exists." *Norcia v. Samsung Telecomm. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (internal quotations omitted).  When looking to the law of contract formation and defenses, courts consider an arbitration agreement's enforceability according to the laws of the state in which the contract was formed.  *AlSafin v. Circuit City Stores, Inc.*, 394 F.3d 1254, 1257 (9th Cir. 2005).

## III.   DISCUSSION

***Whether S.G. Signed the EULA.***  As a preliminary matter, Epic has not met its burden of showing that S.G. himself electronically signed the EULA.  The record indicates that S.G.'s father created the account, so S.G. would not have been required to sign the EULA at that time.  Epic has also not produced adequate evidence showing that it was S.G., and not his father, who signed any updated version of the EULA or signed the EULA when entering a payment method into the Fortnite Item Shop.  While S.G.'s father states that S.G. "made at least some of the purchases at issue . . . using his own money" (Dkt. No. 26-1 ¶ 4), he also states that "[e]ach time a method of payment was entered to enable purchases related to this account, I entered that method of payment myself."  (Dkt. No. 32-4 ¶ 3.)  Nor did S.G.'s counsel concede in their notice letters that S.G. had signed the EULA.  Rather, the letters stated that "[S.G.] . . . may disaffirm *any agreements made*" (Dkt. No. 23-2 at 5 (emphasis added)) and further explained that "[o]ur present dispute with Epic is limited to the disaffirmance by the minor children of any agreements with Epic *to the extent such agreements exist.*"[2]  (Dkt. No. 23-2 at 8 (emphasis added)); *see also* Dkt. No. 23-2 at 12 (letter stating that S.G. "could not and did not enter into any contract with Epic through the current or prior iterations of its End User License Agreement").)

---

[2] Epic also contends that whether S.G. disaffirmed any contract is an issue for the arbitrator, as it concerns whether a valid contract is otherwise unenforceable.  While that principle is correct, it is not relevant to the threshold question of whether S.G. formed an agreement to arbitrate with Epic, which remains a matter for the Court.

5

***Whether the Court or Arbitrator Decides Nonsignatory Formation.*** Instead, the record here supports the conclusion that *either* S.G. *or* his father signed the EULA on numerous occasions, but does not provide the Court with sufficient information to determine which one did so. The undisputed evidence is that S.G.'s father signed the EULA in 2018 at account creation, as EULA acceptance is required during that process, and that the EULA was signed repeatedly afterwards on the account that S.G. and his father shared to allow the account to continue playing Fortnite. (*See* Dkt. No. 23-1 ¶ 28; Dkt. No. 43 ¶ 6.)

Accordingly, to determine whether the EULA binds S.G., one must determine whether S.G.'s father's agreement to the EULA would have bound S.G. Epic contends that the issue of whether S.G.'s father's agreement to the EULA would likewise bind S.G. is a dispute that the EULA delegates to the arbitrator, because it is a dispute about the enforceability or scope of the EULA's arbitration agreement. But the issue of whether an agreement to arbitrate was formed between S.G. himself and Epic is a dispute about contract formation and therefore should be decided by the court. *Kramer*, 705 F.3d at 1127 (9th Cir. 2013). The presence of a signed arbitration agreement between S.G.'s father and Epic does not change the nature of that dispute, because by its own terms that agreement to arbitrate (and to arbitrate arbitrability, by extension) applies only to the signatory ("You") and Epic Games. (Dkt. No. 23-1 at 19-20.)

*Kramer* is instructive here. In *Kramer*, a signed agreement to arbitrate existed between the plaintiff and a car dealership, but not between theplaintiff and the car manufacturer. 705 F.3d at 1127. Though the agreement to arbitrate with the dealership contained a delegation provision agreeing to arbitrate questions about the scope and enforceability of the agreement, the Ninth Circuit nonetheless reserved for itself, and not the arbitrator, the question of whether the plaintiff had agreed to arbitrate disputes with the car manufacturer. *Id.* That issue was treated as one of contract formation, not scope and enforceability. The same reasoning applies here.

The cases cited by Epic in support of the contrary conclusion are unpersuasive. *Sanchez v. Nintendo of America* compelled arbitration on the question of whether the nonsignatory child was bound by the arbitration agreement, but did so in an oral order without providing any

reasoning.  Transcript at 23, *Sanchez v. Nintendo of Am., Inc.*, No. 3:20-cv-06929, ECF No. 46 (N.D. Cal. Mar. 13, 2021).  *Mendieta v. Credit Mgmt., L.P.*, No. 2:23-cv-2512, 2023 WL 6786844, at *3 (C.D. Cal. Sept. 19, 2023), acknowledged that it must determine whether the parties are bound by the agreement and ultimately found an agreement was formed based on equitable estoppel.  That is consistent with the rule in *Kramer*.  Finally, *Karlin v. UATP Springfield, LLC*, 706 S.W.3d 810, 813 (Mo. 2025), addressed an arbitration agreement that expressly stated that it was being signed "on behalf of and as parent or legal guardian for" the child, which is not the case here.  This order therefore proceeds to address the question of formation.

***Formation Based on Pre-existing Relationship.***  Epic has demonstrated that S.G.'s father assented to the EULA on S.G.'s behalf and for S.G.'s benefit.  As a result, S.G. is bound by his father's agreement to arbitrate disputes with Epic.

California law provides that "[a] nonsignatory to an agreement to arbitrate may be required to arbitrate, and may invoke arbitration against a party, if a preexisting confidential relationship, such as an agency relationship between the nonsignatory and one of the parties to the arbitration agreement, makes it equitable to impose the duty to arbitrate upon the nonsignatory."  *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013).  California courts have recognized that the parent-child relationship is one such relationship.  *Crowley Mar. Corp. v. Bos. Old Colony Ins. Co.*, 158 Cal. App. 4th 1061 (2008).

While there is "no bright-line rule . . . that a child's claims must always be arbitrated whenever their parent has entered into an arbitration agreement related to the subject matter of the claims," courts have compelled the child to arbitrate particularly where the parent entered the agreement at least in part for the child's benefit.  *See Yeh v. Tesla, Inc.*, No. 23-CV-01704-JCS, 2023 WL 6795414, at *7-8 (N.D. Cal. Oct. 12, 2023) (binding minor to a parent's agreement to arbitrate claims against Tesla because the parent expressly alleged he purchased a Tesla to protect the safety and privacy of his child); *Cnty. of Contra Costa v. Kaiser Found. Health Plan, Inc.*, 47 Cal. App. 4th 237, 242 (Ct. App. 1996) (minors are bound to "a parent's agreement to

arbitrate medical malpractice claims filed against a health care provider"); *Chan v. Charter Commc'ns Holding Co.*, No. EDCV150886, 2015 WL 12655701, at *5 (C.D. Cal. Aug. 6, 2015) (binding minor to his parent's agreement with telecom service provider to arbitrate claims).

Admittedly, it is not clear whether S.G.'s father was acting for S.G.'s benefit when he signed the EULA upon account creation in 2018, as there is no evidence that S.G. was playing on the account at that point. S.G.'s father's declaration merely states that he set up an account with his own personal details and that he and S.G. "have shared this account over time." (Dkt. No. 26-1 ¶ 3; *see also* Dkt. No. 42 at 21:22-22:6); *S.T.G. by & through Garcia v. Epic Games, Inc.*, 752 F. Supp. 3d 1200, 1212 (S.D. Cal. 2024). Moreover, S.G.'s purchases at issue allegedly occurred several years later from 2022 to 2024. (Compl. ¶ 25.)

The record, however, shows that S.G.'s father's account continued to accept the EULA during the period of the purchases at issue. (Dkt. No. 43 ¶ 6.) (showing that S.G.'s father's account accepted the EULA four times from 2022 to 2024). Even if S.G.'s father, rather than S.G., accepted the EULA on those occasions, the record supports the inference that S.G.'s father did so for both of their benefit on the shared account. S.G.'s father was certainly aware that S.G. was playing Fortnite and making in-game purchases during that time period, since S.G.'s father was debiting S.G.'s account to reimburse himself for S.G.'s purchases using his father's stored payment method. (*See* Dkt. No. 42 at 27:11-28:13.) By assenting to the EULA, which explicitly contemplates a parent consenting to the minor's acceptance of the agreement, S.G.'s father was facilitating S.G.'s ongoing gameplay. S.G.'s father's assent to the EULA is no different than the waiver forms parents routinely sign on behalf of their children to allow them to participate in sports or other recreational activities.

In this context, the preexisting relationship between S.G. and his father makes it "equitable" to impose the duty to arbitrate upon S.G. even if he did not sign the EULA himself. If the law were otherwise, individuals could avoid contractual obligations governing the use of online accounts "simply by having third parties create accounts and then using them as the Plaintiff did," even when the third parties maintained the accounts with the knowledge and

expectation that the plaintiff would use them. *Motise v. America Online, Inc.*, 346 F. Supp. 2d 563, 566 (S.D.N.Y. 2004) (enforcing forum-selection provision where the adult stepson of the account creator used his stepfather's AOL account and asserted claims arising from its use). Indeed, a holding permitting S.G. to play Fortnite on the account his father maintained for both of their use without being bound by the EULA would have implications extending beyond the arbitration clause, as it would exempt S.G. from other provisions of the EULA, such as its anti-cheating and anti-harassment rules.[3]

## IV.   CONCLUSION

S.G.'s sole challenge to the arbitration agreement is based on the issue of contract formation.  Epic has carried its burden to show that either S.G. assented himself or his father assented on his behalf due to their preexisting relationship.  Accordingly, the motion to compel arbitration is **GRANTED**.  Epic had also moved in the alternative to transfer if arbitration was not compelled.  That motion to transfer is **DENIED AS MOOT**.  All claims are stayed pending resolution of the arbitration under 9 U.S.C. § 3.  The parties shall file a joint report every 180 days to update the Court on the arbitration proceedings, starting from the date of this Order, and within 14 days of the proceedings' completion.

**IT IS SO ORDERED.**

Dated: August 26, 2025

RITA F. LIN
United States District Judge

---

[3] This order does not reach Epic's alternative "direct benefits" estoppel theory.